J-S20030-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ELLIOT ROJAS | : | |
| | : | |
| Appellant | : | No. 1077 MDA 2017 |

Appeal from the Judgment of Sentence June 5, 2017
In the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0006689-2016

BEFORE: GANTMAN, P.J., OTT, J., and KUNSELMAN, J.

MEMORANDUM BY OTT, J.: **FILED AUGUST 20, 2018**

Elliot Rojas appeals from the judgment of sentence imposed June 5, 2017, in the York County Court of Common Pleas. The trial court sentenced Rojas to an aggregate term of five years' intermediate punishment, with 30 days' incarceration and 105 days on house arrest, following his non-jury conviction of, *inter alia*, two counts of driving under the influence (DUI) of a controlled substance.[1] On appeal, Rojas contends the trial court erred in denying his pretrial motion to suppress (1) evidence recovered following an illegal search of his truck, and (2) the results of a blood draw taken after he exercised his right to refuse chemical testing pursuant to the Implied Consent Law.[2] For the reasons below, we affirm.

---

[1] 75 Pa.C.S. §§ 3802(d)(1)(i), (iii).

[2] 75 Pa.C.S. § 1547(b)(1).

The trial court aptly summarized the facts presented during the pretrial suppression hearing as follows:

> The Court heard testimony from Northeast Regional Police Officer Corey Sh[ae]ffer. On the night of September 24, 2016, he was on routine patrol traveling west on Saginaw Road in East Manchester Township behind a green and silver Dodge pickup truck. Officer Sh[ae]ffer observed the truck drift to the right and the passenger side tires drift onto the fog line. When he ran the registration plate through his computer, it came back with no expiration date, which Sh[ae]ffer identified as a "dead tag" or an unregistered plate.
>
> Officer Sh[ae]ffer then activated his emergency lights to initiate a traffic stop. Sh[ae]ffer estimated that after he turned on his emergency lights, the truck continued to travel for 300-500 feet for around 45 seconds. While he followed the truck with his emergency lights on, he observed the head and torso of the driver lean over 2 to 3 times at a 45 degree angle towards the center console.
>
> Once the vehicle stopped, Sh[ae]ffer approached the vehicle and asked the driver/[Rojas], as well as a passenger to step out of the truck. He asked them to step out of the vehicle for his own safety due to the furtive movements he witnessed while following the truck, and his belief that there was "a high probability [Rojas] could possibly be stashing a weapon or narcotics." Sh[ae]ffer patted down both [Rojas] and the passenger and found no weapons on their persons, and informed them he was conducting the pat down due to the furtive movements.
>
> Sh[ae]ffer then informed [Rojas] and the passenger that he was going to search the truck, but was going to wait for his backup to arrive before beginning the search. The backup then arrived and after briefing his backup to the situation, Sh[ae]ffer walked back to [Rojas] and asked him if there was anything in the vehicle of which he needed to be aware. Sh[ae]ffer stated that [Rojas] "stated something to the effect of that there was a little bud in the vehicle[,]" which from his training and experience the Trooper knew bud to mean marijuana. [Rojas] stated that the bud was under the driver's seat. Sh[ae]ffer asked [Rojas] if he was attempting to stash the marijuana while Sh[ae]ffer was attempting to stop him, to which [Rojas] replied yes. [Rojas] also

indicated that he was on his way back from a friend's house and that he had smoked marijuana there.

Sh[ae]ffer then conducted a search of the truck and found a multi colored glass pipe on the rear passenger seat floor board, which he knew is commonly used for smoking marijuana; he also found a partially burnt marijuana joint inside a pack of cigarettes on the passenger side dashboard. Sh[ae]ffer could not find any marijuana in the place where [Rojas] indicated, but after questioning [Rojas] again, [Rojas] indicated that the marijuana was under the rear seat of the vehicle and not the driver's seat as previously indicated. Schaeffer found a substance under the rear seat which was field tested, which resulted in a positive test for marijuana, and was sent to the State Police Lab in Harrrisburg.

While talking with [Rojas], Sh[ae]ffer noticed the [odor] of intoxicating beverages coming from [Rojas], and after the search of the vehicle, had [Rojas] attempt a series of field sobriety tests. At the conclusion of the testing, Sh[ae]ffer placed [Rojas] under arrest for suspicion of Driving Under the Influence. After being placed under arrest, [Rojas] agreed to a Drug Recognition Evaluation (DRE) at the scene, but then changed his mind and would not submit to the DRE evaluation at the Police Station. [Rojas] was then taken to York County Central Booking and read the DL-26 form to consent to blood draw for chemical testing. [Rojas] did not consent to the blood draw. At that point, Sh[ae]ffer then got a search warrant for the blood draw for chemical testing, which was shown to [Rojas]. [Rojas] then submitted to the blood draw per the search warrant.

Trial Court Opinion, 11/16/2017, at 2-4 (record citations omitted).

Rojas was subsequently charged with five counts of DUI (alcohol and controlled substances), one count each of possession of a small amount of marijuana and possession of drug paraphernalia, and two summary motor vehicle violations.[3] On December 19, 2016, Rojas filed a pretrial motion to

_____

[3] **See** 75 Pa.C.S. §§ 3802(a)(1)(i), (d)(1)(i) and (iii), (d)(2), and (d)(3), 35 P.S. §§ 780-113(a)(31)(i) and (a)(32), and 75 Pa.C.S. §§ 1301(a) (required

suppress the evidence recovered during the search of his vehicle and subsequent blood test. The court conducted a suppression hearing on January 30, 2017, and denied the motion on February 22, 2017. Rojas proceeded to a stipulated non-jury trial on June 5, 2017. The trial court found him guilty of two counts of DUI (§§ 3802(d)(1)(i) and (iii)), based on the presence of marijuana in his blood, but not guilty of the DUI counts requiring evidence of impairment (§§ 3802(a)(1), (d)(2), and (d)(3)). The court also found him guilty of the remaining offenses. That same day, Rojas was sentenced to a term of five years' intermediate punishment, with 30 days' incarceration and 105 days' house arrest, on one count of DUI, and concurrent terms of 30 days' probation and 12 months' probation, respectively, for his convictions of possession of marijuana and drug paraphernalia. This timely appeal followed.[4]

Rojas raises two issues on appeal, both of which challenge the trial court's denial of his suppression motion. Our well-settled standard of review is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the

---

registration and certificate of title) and § 1786(f) (required financial responsibility), respectively.

[4] On July 12, 2017, the trial court ordered Rojas to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and granted Rojas' request for bail pending appeal. Rojas complied with the court's directive, and filed a concise statement on July 20, 2017.

suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

*Commonwealth v. Freeman*, 150 A.3d 32, 34–35 (2016) (quotation omitted), *appeal denied*, 169 A.3d 524 (Pa. 2017).

In his first issue, Rojas contends the search of his vehicle was improper. *See* Rojas' Brief at 15. It merits emphasis he does not challenge Officer Shaeffer's authority to either (1) stop his vehicle, based on the suspected "dead tag," or (2) frisk him, based on his "furtive movements." *Id.* Rather, Rojas insists that once the frisk "turned up nothing," Officer Shaeffer "no longer had any legitimate fear for his safety," so that the subsequent search of Rojas' vehicle was improper. *Id.* Moreover, because the search led to the discovery of the marijuana and paraphernalia, and it was only after the officer announced he would be searching the truck that Rojas admitted he had smoked marijuana earlier that evening, Rojas insists all of the evidence, including the blood testing, must be suppressed. *See id.* at 21.

In *Commonwealth v. Morris*, 644 A.2d 721 (Pa. 1994), *cert. denied*, 513 U.S. 1031 (1994), the Pennsylvania Supreme Court adopted the standard

set forth by the United States Supreme Court in *Michigan v. Long*, 463 U.S. 1032 (1983), to justify a protective search of a vehicle:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. "[T]he issue is whether a reasonably prudent man would be warranted in the belief that his safety or that of others was in danger."

*Morris*, *supra*, 644 A.2d at 723, *quoting* *Long*, *supra*, 463 U.S. at 1049-1050.[5]  Furthermore, in considering cases involving vehicle stops, this Court has recognized that police officers face a "heightened risk of danger" during "roadside encounters," while citizens possess a "lessened expectation of privacy" with respect to their vehicles.  *In re O.J.*, 958 A.2d 561 (Pa. Super. 2008), *appeal denied*, 989 A.2d 918 (Pa. 2010).

Here, the trial court concluded "Officer Shaeffer was legally justified to search [Rojas'] vehicle."  Trial Court Opinion, 11/20/2017, at 5.  The court opined:

> Protective searches are justified when police have a reasonable belief that the suspect poses a danger.  *Michigan v. Long*, 463

---

[5] Because the officer herein conducted a protective sweep for weapons, he needed only demonstrate reasonable suspicion to justify his search. Therefore, the facts of this case do not implicate the automobile exception requiring probable cause set forth in the Pennsylvania Supreme Court's plurality decision in *Commonwealth v. Gary*, 91 A.3d 102 (Pa. 2014). *See id.* at 138 (adopting federal automobile exception to warrant requirement and permitting officers to search a vehicle when there is probable cause to do so; "no exigency beyond the inherent mobility of a motor vehicle is required").

U.S. 1032 (1983). The search of a passenger compartment of an automobile is permissible if the officer possess[es] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts reasonably warrant the officer's belief that the suspect is dangerous and may gain immediate control of weapons. *Id.* at 1049. Based upon the facts in the case at hand, Officer Sh[ae]ffer reasonably believed that [Rojas] was potentially trying to conceal or retrieve a weapon. This was supported by the fact [Rojas] did not immediately pull over once Officer Sh[ae]ffer engaged his emergency lights, instead traveling another 500 feet before stopping his vehicle. Officer Sh[ae]ffer also witnessed [Rojas] making furtive movements towards the area of the center console. Officer Sha[e]ffer made a rational inference based upon his training and experience that [Rojas] was attempting to reach for or conceal a weapon. This inference would establish a reasonable belief that [Rojas] was dangerous and would justify a protective search.

*Id.* at 5-6. As an independent basis to support the search, the court noted Rojas "admitted prior to the search being conducted that he was engaged in illegal activity by possessing illegal drugs, namely a bud of marijuana." *Id.* at 6. Noting it is "not uncommon for suspects to admit to lesser offenses in the hope of diverting an officer from more serious misconduct[,]" the trial court explained "it would have been extremely hazardous for the officer to permit [Rojas] and his passenger to return to [Rojas'] vehicle, by assuming [Rojas] was being completely truthful, without conducting a sweep for weapons upon [Rojas] volunteering he possessed illegal drugs." *Id.* at 6-7. Accordingly, the court determined the search was lawful.

Preliminarily, we agree with Rojas' contention that the trial court erred when it considered Rojas' admission he had marijuana in the car as support for the search. When Rojas made the statement, Officer Shaeffer had already announced his intention to search the vehicle, and had called for backup. *See*

N.T., 1/30/2017, at 28. Therefore, Rojas' admission could not have formed part of the officer's reasonable suspicion to search the vehicle.

Nevertheless, the trial court determined Officer Shaeffer had reasonable suspicion to search the vehicle independent of Rojas' admission. Rojas insists, however, the court's reasoning is flawed because "any safety concerns" Officer Shaeffer had were "dispelled" prior to his search of the truck, when the officer's frisk of both Rojas and his passenger revealed no weapons. Rojas' Brief at 17. Furthermore, Rojas emphasizes he explained his furtive movements to the officer, "telling Shaeffer he had been reaching for his driver's license[,]" which was in his hand during the frisk. *Id.* at 19. Under these factual circumstances, Rojas argues the trial court was "mistaken" when it determined "it would have been 'extremely hazardous' to conclude the traffic stop without searching the truck." *Id.* In support, Rojas relies primarily upon *United States v. Austin*, 269 F.Supp.2d 629 (E.D. Pa. 2003), and *Commonwealth v. Graham*, 721 A.2d 1075 (Pa. 1998). We find Rojas' reliance on these decisions to be misplaced.

First, we note *Austin* is a federal district court decision, and therefore, not binding precedent. *See Commonwealth v. Lambert*, 765 A.2d 306, 315, n.4 (Pa. Super. 2000) ("Absent a United States Supreme Court pronouncement, decisions of federal courts are not binding on state courts, even when a federal question is involved."). Moreover, the facts of that case are distinguishable. In *Austin*, police officers stopped the defendant's vehicle for running a red light. The defendant was cooperative with police, but while

he was exiting the vehicle, he "reach[ed] down under the driver's seat with his right hand." ***Austin***, ***supra***, 269 F.Supp.2d at 631. Concerned for his safety, one of the officers "grabbed" the defendant's arm, and "observed that [the defendant] had reached for his cell phone." ***Id.*** At that point, the officers removed the defendant from his vehicle, frisked him, and placed him in the police car. Although the defendant was nervous during this encounter, he did not resist, nor did the officers' frisk of the defendant reveal any weapons or contraband. The officers then proceeded to search the car, and recovered a firearm and ammunition. ***See id.***

In granting the defendant's motion to suppress, the federal district court concluded:

> [The police officer] was justified in reaching into the car and grabbing the defendant's arm to dispel his suspicions that [the defendant] had reached for a weapon. However, when [the officer] realized [the defendant] had reached for a cell phone, not a weapon, there was no reason to believe that he was dealing with an armed or dangerous individual. The officers' actions thereafter were understandably based on the continued rush of adrenalin, but there was no basis for reasonable suspicion that the defendant had a weapon on his person or in his vehicle. Defendant was also understandably nervous after the encounter over the cell phone, but he was not violent.
>
> According to the government, the defendant's nervous behavior and the defendant's efforts to reach beneath his seat for a cell phone created reasonable suspicion. However, these factors, independently as well as combined, do not amount to reasonable suspicion.

***Id.*** at 634.

Unlike the facts in ***Austin***, here, Officer Shaeffer did not know what Rojas was reaching for or hiding when he bent over two to three times before

- 9 -

stopping his car. Although Rojas contends he was reaching for his license, and had his license in his hand after the stop, Officer Shaeffer was not obliged to believe him. Indeed, the officer explained that when a suspect reaches for his license before a stop "it's just a simple arm movement." N.T., 1/30/2017, at 41. However, in this case, the officer's suspicion was aroused because of Rojas' "exaggerated shifting of [his] body." *Id.* Accordingly, Officer Shaeffer's reasonable suspicion was supported by the fact that (1) Rojas failed to immediately pull over when the officer activated his lights, and continued to drive 300-500 feet, making two turns;[6] and (2) during that time Rojas made "multiple furtive movements," bending at a "45 degree angle, if not further, over towards the top of the center console." *Id.* at 23-24.

Rojas' reliance on *Graham* is similarly misplaced. First, *Graham* did not involve a motor vehicle stop. Rather, the officer was patrolling a high crime area when he observed the defendant and two other males, one of whom had an outstanding warrant, on the porch of a day care center. *See Graham*, 721 A.2d at 1076. As the men began to walk away, the officer instructed them to stop, and told the defendant's companion that he had a warrant for his arrest. At that time, the officer noticed a bulge in the defendant's front pocket. The officer patted down the defendant, "[i]n order to allay his concerns for safety," and felt what he believed to be money, which

_____

[6] Officer Shaeffer testified: "From the time that I activated my emergency lights on Saginaw Road to, say, Sherman Street where the vehicle stopped at that stop sign, there were multiple areas in which that vehicle could have pulled over but didn't." N.T., 1/30/2017, at 24.

the defendant confirmed. *Id.* However, the officer then proceeded to pat down the defendant's back pocket and felt a lifesavers container. When he shined a flashlight in the pocket, the officer observed that the container held cocaine. *See id.* at 1076-1077. The trial court denied the defendant's motion to suppress.

On appeal, the Pennsylvania Supreme Court found the officer's initial pat-down of the defendant's front pocket "immediately relieved his fear that [the defendant] was not carrying a weapon." *Id.* at 1078. Further, the *Graham* Court explained that before shining his flashlight in the defendant's back pocket, the officer's pat-down revealed the defendant was "not carrying a weapon." *Id.* at 1079. Therefore, the Court held "any continued search exceeded the scope authorized under *Terry*[ *v. Ohio*, 392 U.S. 1 (1968)]." Again, the facts presented herein are clearly distinguishable. Officer Shaeffer observed Rojas make furtive movements **in his car** after refusing to immediately pull over. Accordingly, although his frisk of Rojas revealed no weapons on his person, it did not alleviate his concern that Rojas may have a weapon in his vehicle.

Rather, we find this Court's decision in *Commonwealth v. Buchert*, 68 A.3d 911 (Pa. Super. 2013), *appeal denied*, 83 A.3d 413 (Pa. 2014), instructive. In that case, two officers on patrol duty after midnight pulled over a vehicle for having a broken tail light. When the officers approached the vehicle, they observed the defendant, who was the front seat passenger, "bending forward and appearing to reach under the seat." *Id.* at 912. The

officers directed the defendant and the driver to stop moving, which they did. However, the officers noticed the defendant appeared nervous. *See id.* Both men were instructed to exit the vehicle, and a frisk of the defendant revealed no weapons or contraband. Thereafter, one of the officers "performed a search of the defendant's 'immediate area of control'" and observed "the handle of a gun as he bent forward to look under the passenger seat." *Id.* The trial court subsequently granted the defendant's motion to suppress, concluding the officers did not have probable cause to search the passenger compartment of the vehicle. *See id.* at 913. On appeal, a panel of this Court reversed.

The panel first agreed with the Commonwealth that the trial court applied the incorrect standard in determining whether the search of the vehicle was lawful, since the officers needed only "reasonable suspicion to conduct a *Terry* protective weapons search," not probable cause *Id.* at 916. Moreover, the panel concluded that, under the totality of the circumstances, the police officers possessed the requisite reasonable suspicion to justify the protective search of the vehicle. The panel opined:

> The combination of [the defendant's] furtive movement of leaning forward and appearing to conceal something under his seat, along with his extreme nervousness and the night time stop, was sufficient to warrant a reasonable police officer to believe that his safety was in danger and that [the defendant] might gain immediate control of a weapon.

*Id.* at 916-917.

- 12 -

The facts in this case are similar. Here, the stop occurred at night in a rural area, but unlike in **Buchert**, Officer Shaeffer was alone. Rojas did not immediately pull over when the officer activated his emergency lights, but rather continued to drive for 300-500 feet, making two turns. Most significantly, Officer Shaeffer observed Rojas make "multiple furtive movements in the area of the center console" during the period when he refused to stop. N.T., 1/30/2017, at 23. Accordingly, we agree with the trial court's conclusion that Officer Shaeffer possessed the requisite reasonable suspicion to conduct a protective search of the area in Rojas' vehicle where he observed Rojas make furtive movements. Therefore, the court properly denied Rojas' motion to suppress the evidence recovered from the truck.

In his second claim, Rojas argues, alternatively, the results of his blood draw should have been suppressed because he refused to submit to chemical testing pursuant to the Implied Consent Law. **See** Rojas' Brief at 22.

Pennsylvania's Implied Consent Law, codified at 75 Pa.C.S. § 1547, provides, in relevant part:

> Any person who drives, operates or is in actual physical control of the movement of a vehicle in this Commonwealth **shall be deemed to have given consent to one or more chemical tests of breath or blood** for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a vehicle in violation of section 1543(b)(1.1) (relating to driving while operating privilege is suspended or revoked), 3802 (relating to driving under influence of alcohol or controlled substance) or 3808(a)(2) (relating to illegally operating a motor vehicle not equipped with ignition interlock).

- 13 -

75 Pa.C.S. § 1547(a) (emphasis supplied). However, the statute also gives the driver the right to refuse testing, albeit subjecting him to a mandatory license suspension of at least 12 months. *See* 75 Pa.C.S. § 1547(b).

In *Commonwealth v. Miller*, 996 A.2d 508 (Pa. Super. 2010) (*en banc*), *appeal denied*, 20 A.3d 485 (Pa. 2011), an *en banc* panel of this Court explained:

> [T]he purpose underlying [implied consent] is to enable the police to obtain evidence of intoxication or drug use to be utilized in criminal proceedings. It is not to hinder law enforcement officers in performing their duties under sections 3755 [relating to blood draws for medical purposes] and 1547 when they have probable cause.

*Id.* at 513 (internal punctuation and quotations omitted).

Rojas insists the plain language of the statute compels suppression of his blood test results because he refused to submit to testing. *See* Rojas' Brief at 22. He emphasizes the statute clearly states: "If any person placed under arrest for a violation of section 3802 is requested to submit to chemical testing and refuses to do so, **the testing shall not be conducted**[.]" 75 Pa.C.S. § 1547(b)(1) (emphasis supplied). Rojas contends the language is unambiguous, and the statute does not provide an exception for the police to obtain a search warrant. *See* Rojas' Brief at 23-24. Although he acknowledges Section 1547 was amended in July of 2017 "to make it possible to conduct the test Rojas challenges here,"[7] he argues the fact the amendment

---

[7] The 2017 amendment added subsection (b.3), which provides:

was not effective for six months after its enactment signifies it was a substantive change in the law, and not a mere "'clarifying' amendment." *Id.* at 25. Furthermore, Rojas maintains that because the statute is penal in nature, it must be construed strictly and in his favor. *See id.* at 26. Lastly, he insists Pennsylvania case law has "repeatedly found … that the Implied Consent statute includes a right to refuse testing." *Id.* at 27.

The trial court disposed of this claim as follows:

> If it was the intent of the legislature that once an actor refuses to submit to chemical testing that no testing shall occur, even if a valid search warrant is obtained, then it would state that expressly in the statute. The intent of the Implied Consent Law is to encourage those arrested for Driving Under the Influence to cooperate with police to provide a blood draw. "The purpose of 75 Pa.C.S. § 1547 and prior enactments has been to facilitate the acquisition of chemical analyses and to permit their utilization in legal proceedings." *Commonwealth v. Tylwalk*, 258 Pa. Super. 506, 511, 393 A.2d 473, 475 (1978). To read into the statute a ban on obtaining a search warrant once a suspect refuses a blood draw is not necessary to the construction of the statute, and it would conflict with the obvious purpose of the statute in facilitating chemical testing for DUI offenses. This is especially true in light of the fact that obtaining consent is in fact an exception to the requirement of obtaining a search warrant.

---

> **(b.3) Limitation.--**Nothing in this section shall be construed as limiting the ability of law enforcement to obtain chemical testing pursuant to a valid search warrant, court order or any other basis permissible by the Constitution of the United States and the Constitution of Pennsylvania.

75 Pa.C.S. § 1547(b.3).

- 15 -

Trial Court Opinion, 11/20/2017, at 9.

While we agree Rojas correctly cites the rules of statutory construction with regard to the plain meaning of words in a statute,[8] a panel of this Court recently emphasized, "we read words in accordance with their ordinary meaning, taking into account their overall context and avoiding unreasonable or absurd constructions." *Commonwealth v. Null*, ___ A.3d ___, ___, 2018 PA Super 85, *6 (Pa. Super. 2018). *See also Commonwealth v. Lewis*, 180 A.3d 786, 790-791 (Pa. Super. 2018) (holding immunity granted to reporters and victims under the Drug Overdose Response statute is available to a self-reporter, despite fact the language of the statute "implicitly condition[s] the grant of immunity on the presence of two parties," the reporter and "another person" in need of medical assistance; the Legislature could not have "intended to weigh the life of a self-reporter below the life of a drug overdose victim who has a conscientious associate.").

Indeed, the purpose of the Implied Consent Law is to assist police officers in their ability to obtain evidence of intoxication for criminal proceedings. *See Miller*, *supra*. Pursuant to the statute's explicit terms, when a defendant refuses chemical testing, the officer cannot proceed with a blood draw under the Implied Consent Law. However, at the time Rojas was arrested, the statute did not address the officer's ability to apply for a search warrant in order to obtain chemical testing. As Rojas points out in his brief,

_____

[8] *See* Rojas' Brief at 22-24.

Section 1547 was amended in July of 2017 to address this very situation. **See** 75 Pa.C.S. § 1547(b.3). Contrary to his contention, however, we find the amendment clarified the law, rather than constituted a substantive change.[9]

Voluntary consent is a well-recognized exception to the warrant requirement. **Commonwealth v. Strickler**, 757 A.2d 884, 888 (Pa. 2000). With regard to Section 1547, our Supreme Court has recently opined: "If neither voluntary consent nor some other valid exception to the warrant requirement is established, then a chemical test may be conducted only pursuant to a search warrant." **Commonwealth v. Myers**, 164 A.3d 1162, 1181 (Pa. 2017).[10] However, Rojas insists police officers have a choice to

---

[9] The fact that the amendment was not immediately effective is a red herring. The amendment not only added subsection (b.3), but also added subsection (b.2) requiring the payment of restoration fees, and amended eight other sections of the Motor Vehicle Code dealing with drivers' licenses, suspensions or revocations.

[10] We note **Myers**, **supra**, was a plurality decision. It was written by Justice Wecht, and joined in full by Justices Donohue and Dougherty. Justice Saylor wrote a concurring opinion, that was joined in full by Justice Baer and in part by Justice Donohue. Justice Todd also wrote a concurring opinion, and Justice Mundy wrote a dissent. However, the differing opinions focused on the particular facts of the case, specifically, that the defendant was unconscious when his blood was drawn. The plurality opinion determined, *inter alia*, that the consent element in the Implied Consent Law must be "voluntary." **Myers**, **supra**, 164 A.3d at 1180-1181. Justice Saylor, however, found the blood draw was unconstitutional under **Birchfield v. North Dakota**, 136 S.Ct. 2160 (U.S. 2016), quoting the language in that case which stated the police "may apply for a warrant" when they desire to obtain a blood test from an unconscious defendant. **Myers**, **supra**, 164 A.3d at 1183. Justice Todd concluded the defendant's statutory right to refuse blood testing was violated and would not have addressed the constitutional issue. **See id.** at 1184. Justice Mundy, however, found that under the plain language of the statute,

proceed **either** under the Implied Consent Law, or by obtaining a warrant. Rojas' Reply Brief at 8. He states: "[W]hen officers [] proceed under the Implied Consent statute, they must honor all the statute's dictates – not just those that are convenient to expeditious law enforcement." *Id.*

We find Rojas' interpretation of the statute would lead to an absurd result. As noted *supra*, the purpose of the Implied Consent Law is to assist police officers in obtaining evidence for criminal proceedings. ***See Miller***, ***supra***. There is no support for Rojas' contention that an officer must decide, at the onset of his investigation, whether he will proceed under the Implied Consent Law, or pursuant to a warrant. Both the Fourth Amendment of the United States Constitution, and Article I, Section 8 of the Pennsylvania Constitution protect citizens from "unreasonable searches and seizures" conducted without a warrant and without probable cause. U.S. Const. Amend IV; Pa. Const. Art. 1 § 8. Here, there is no dispute Officer Shaeffer applied for and obtained a warrant authorizing Rojas' blood draw. Accordingly, Rojas' constitutional rights were protected, and he is entitled to no relief.

Judgment of sentence affirmed.

_____

the defendant did not revoke his implied consent, and because there was "no dispute that probable cause for DUI existed," the warrantless blood draw was permissible. *Id.* at 1186. None of the differing opinions support Rojas' contention that an officer cannot obtain a warrant after a defendant revokes his implied consent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/20/2018